**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Dustin Matthews,                              )    No.  CV-22-00407-PHX-SPL
                                             )
                    Plaintiff,               )
                                             )    **ORDER**
vs.                                          )
                                             )
City of Tempe, et al.,                       )
                                             )
                    Defendants.              )
                                             )
_____             )

Before the Court is Plaintiff Dustin Matthews' ("Plaintiff") Motion for Partial Summary Judgement ("MPSJ") (Doc. 53) and Motion for Sanctions (Doc. 105). The Motions are fully briefed and ready for review. (Docs. 53, 105, 117, 121, 123, 128). Having reviewed the parties' briefing, the Court denies both Motions for the following reasons.[1]

## I.    **BACKGROUND**

This is an employment discrimination action arising out of Plaintiff's employment with Defendant City of Tempe (the "City"). (*See* Doc. 52, "Complaint"). Plaintiff was employed at the Tempe Municipal Court (the "Tempe Court") until his termination on December 27, 2021. (*Id.* at 4, 14). Plaintiff brings this action against the City and the following individuals: Senior Human Resources Analyst Adrianne Ward, Court Administrator Alexis Allen, Deputy Court Administrator Jennifer Curtiss, and Court

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. See LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Services Supervisor Marcos Romero ("Individual Defendants" and, together with the City, "Defendants"). (*Id.* at 2–3). Plaintiff alleges that he was subjected to gender discrimination, retaliation, and a hostile work environment during his employment. (*Id.* at 6–7).

According to the Complaint, the Tempe Court "implemented a telecommuting schedule" in response to the COVID-19 pandemic "on or about April/May of 2020." (*Id.* at 6). Defendants confirm this, stating that on April 7, 2020 the Tempe Court "implemented a bi-weekly telecommuting schedule allowing employees to alternate on a schedule between telecommuting a week and working onsite a week." (Doc. 120 at 16). The biweekly telecommuting schedule ended on October 7, 2020. (*Id.*). On December 7, 2020, the Tempe Court "reimplemented a rotational telecommuting schedule." (*Id.*). Defendant Romero, Plaintiff's supervisor, "instituted a five-week rotational schedule for his team, with employees being in the office for four weeks and then eligible to telecommute the fifth week." (*Id.*). Defendants also contend that around that same time the Tempe Court "started a temporary process to allow those who were returning to work from approved [Families First Coronavirus Response Act ("FFCRA")] leave to telecommute for their first week of returning to work, before having to work on site" (the "transition period"). (*Id.* at 16–17). On March 22, 2021, the Tempe Court terminated the rotational telecommuting and transition period policies. (*Id.* at 17).

Plaintiff alleges that female employees—specifically, Plaintiff's co-workers Veronica Reyes, Maritza Deadrick, and Jamie Hedlund, who are not parties in this action—were allowed to work from home "outside of the regular telecommuting schedule."[2] (Doc. 52 at 10). Plaintiff alleges in the Complaint that Ms. Reyes and Ms. Hedlund were permitted to work remotely "[b]etween the end of December [2020] through 2/22/21." (*Id.* at 11). Meanwhile, Plaintiff alleges that his own requests to telecommute during this time were denied; he was only allowed to work remotely when the rotational schedule allowed

---

[2] Plaintiff's Complaint refers to Ms. Reyes. (*See* Doc. 52 at 11). In his Motion and its accompanying Statement of Facts, however, Plaintiff does *not* refer to Ms. Reyes and mentions only Ms. Deadrick and Ms. Hedlund. (*See* Doc. 53 at 4, 7, 13, 31; Doc. 54 at 3).

it. (*Id.* at 10–12). Plaintiff also alleges that Ms. Deadrick and Ms. Hedlund were allowed the one-week transition period but that he was denied the same. (Doc. 53 at 4, 7, 13, 31; Doc. 54 at 3). Plaintiff contends that Defendants' denial of his requests to telecommute was discriminatory on the basis of gender.

On January 7, 2021, Plaintiff filed a gender discrimination complaint with the City's Human Resources Department. (Doc. 52 at 6). Plaintiff alleges that Defendants failed to properly investigate his discrimination claim and instead began retaliating against him by disciplining him and by eventually terminating his employment. The alleged retaliation consisted of two formal disciplines; the first occurred on March 18, 2021 and resulted in a written reprimand and the second occurred in September 2021 and ultimately resulted in his termination. (*Id.* at 6, 13). In addition to discrimination and retaliation, Plaintiff also alleges that Defendants created a hostile work environment "by engaging in a series of retaliatory acts against me," which included "altering [his] time sheets, ignoring City Rules and Court Policies, recruiting other employees to watch [him] and report back to them, subjecting [him] to erroneous disciplinary actions, sustaining the false allegations, and denying [him] the right to use accrued paid time off and sick time." (*Id.* at 7).

On March 16, 2022, Plaintiff filed this action. (Doc. 1). On August 26, 2022, Plaintiff filed an Amended Complaint (Doc. 52), which serves as the operative complaint in this matter. Plaintiff brings claims for gender discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and similar claims under 42 U.S.C. §§ 1981 and 1983. (Doc. 52 at 4). Plaintiff also brings several related claims under Arizona state law. (*Id.*). On August 28, 2022, Plaintiff filed the Motion for Partial Summary Judgment (Doc. 53). Given that discovery was not yet completed, the Court granted Defendants' request for an extension of time to respond to Plaintiff's Motion. (Doc. 91). On October 27, 2022, Plaintiff filed the Motion for Sanctions (Doc. 105), which is also at issue in this Order. On November 21, 2022, Defendants responded to Plaintiff's Motion for Sanctions. (Doc. 117). On November 28, 2022, Defendants timely responded to Plaintiff's Motion for Partial Summary Judgment

1   (Doc. 123) and Plaintiff filed a Reply brief regarding his Motion for Sanctions (Doc. 121).

2   On December 15, 2022, Plaintiff filed a Reply brief regarding his Motion for Partial

3   Summary Judgment. (Doc. 128).

4   **II.      LEGAL STANDARD**

5          Summary judgment is appropriate where "the movant shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

8   Material facts are those facts "that might affect the outcome of the suit under the governing

9   law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of

10  material fact arises if "the evidence is such that a reasonable jury could return a verdict for

11  the nonmoving party." *Id.*

12         The party moving for summary judgment bears the initial responsibility of

13  presenting the basis for its motion and identifying those portions of the record, together

14  with affidavits, which it believes demonstrate the absence of a genuine issue of material

15  fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production,

16  the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

17  *Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial

18  responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual

19  dispute and that the fact in contention is material. *Anderson*, 477 U.S. at 250. In other

20  words, the nonmovant "must do more than simply show that there is some metaphysical

21  doubt as to the material facts," and, instead, must "come forward with 'specific facts

22  showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*

23  *Corp.*, 475 U.S. 574, 586-87 (1986).

24         When considering a motion for summary judgment, the judge's function is not to

25  weigh the evidence and determine the truth but to determine whether there is a genuine

26  issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must view the factual

27  record and draw all reasonable inferences in the nonmovant's favor. *Leisek v. Brightwood*

28

*Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.   **DISCUSSION**

Plaintiff requests summary judgment as to several of his claims as well as sanctions for Defendants' alleged misconduct. The Court will first address Plaintiff's Motion for Partial Summary Judgment and then turn to his Motion for Sanctions.

### A. Motion for Partial Summary Judgment

Plaintiff seeks summary judgment as to his disparate treatment claims under Title VII and § 1983. (Doc. 53 at 2–17). He also seeks summary judgment as to his retaliation claims under §§ 1981 and 1983. (*Id.* at 17–36). Finally, Plaintiff seeks summary judgment as to his Arizona state law claims and as to the issue of qualified immunity. (*Id.* at 36–37).

### 1.  *Disparate Treatment Claims Under Title VII and § 1983*

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, § 1983 provides a right of action for individuals whose constitutional rights are violated by state actors and thus offers an avenue of relief for public employees who are injured by their employer's discriminatory conduct. *See* 42 U.S.C. § 1983; *see also Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985) (citations omitted) (recognizing that § 1983 "incorporates the equal protection standards that have developed in fourteenth amendment jurisprudence" and therefore permits claims for gender discrimination in employment).

"[A] plaintiff alleging discrimination under Title VII may proceed under two theories of liability: disparate treatment or disparate impact." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1484 (9th Cir. 1993) (citation omitted). "While intent is not relevant to a disparate impact theory of recovery, the disparate treatment theory *does* require proof of discriminatory intent." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021) (emphasis added) (citing *Garcia*, 998 F.2d at 1484). Similarly, § 1983 claims alleging employment discrimination center around a consideration of the defendant's intent. *See*

*Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (citation omitted) ("The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose."); *Lam v. City & Cnty. of S.F.*, 868 F. Supp. 2d 928, 951 (N.D. Cal. 2012) ("In the equal protection context, just as in a Title VII disparate treatment case, the fundamental question revolves around the plaintiff's ability to demonstrate a discriminatory 'purpose' or intent."). Given that Title VII and § 1983 discrimination claims each rely on a showing of discriminatory intent, courts are generally guided by Title VII analysis when analyzing § 1983 claims. *See Lam*, 868 F. Supp. 2d at 951 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993)) ("[G]enerally, when analyzing claims of disparate treatment in employment under § 1981 or § 1983, a district court is guided by Title VII analysis.").

A plaintiff may establish discriminatory purpose or intent "by producing direct or circumstantial evidence demonstrating that a discriminatory reason *more likely than not* motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Ballou*, 29 F.4th at 422 (quotations and citations omitted) (emphasis added). The Supreme Court has instructed that the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is not applicable "where the plaintiff presents direct evidence of discrimination." *TransWorld Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). That said, in the *absence* of direct evidence, "plaintiffs can, and frequently do, rely on the burden-shifting framework set out in *McDonnell* . . . as a way of channeling inquiry into the available circumstantial evidence." *Ballou*, 29 F.4th at 422.

Here, Plaintiff begins by asserting that he has demonstrated *direct* evidence that Defendants were motivated by a discriminatory reason and that the Court need not consider the *McDonnell Douglas* burden-shifting framework. (Doc. 53 at 2–5; Doc. 128 at 1 ("The defendant's position that I did not establish the third or fourth elements of the *McDonnel[l] Douglas* test is not applicable because I have presented direct evidence of discrimination.")). The Court does not agree. Under a heading titled "Direct Evidence," Plaintiff's Motion primarily focuses on Plaintiff's contention that Defendants failed to

inform him and other employees of the Tempe Court's transition period policy. (Doc. 53 at 2–4). As noted above, this policy permitted employees who were returning from an approved FFCRA leave to telecommute for one week upon their return from leave.[3] (Doc. 120 at 16–17). Plaintiff contends that he was never informed of this policy and that it was "made up to intentionally [] mislead the Attorney General investigator and conceal the discrimination I was subjected to." (Doc. 53 at 3–4). Specifically, Plaintiff asserts that Defendant Ward made "no mention" of the policy in her response to Plaintiff's internal complaint of gender discrimination, and that Defendant Allen has admitted that the policy was not made available online and that employees eligible for the transition period were instead informed directly. (*Id.* at 3). According to Plaintiff, Defendants' position that Plaintiff was not eligible for one week of telecommuting because he had exhausted his FFCRA leave "is not plausible" because "all employees were eligible [for the additional week of leave] as long as they were experiencing a COVID related issue." (*Id.* at 4).

It bears repeating that the "direct evidence" required to avoid the *McDonnell Douglas* test must, in this case, *directly* demonstrate discrimination based on gender. "Direct evidence is 'evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption' and 'typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.'" *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 993 (E.D. Cal. 2016) (quoting *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005)). Plaintiff's extended discussion of Defendants' "transition period" policy contains no such evidence of gender-based animus; in fact, the discussion has no direct relation to Plaintiff's gender at all. Even assuming Plaintiff's contentions concerning the "transition period" are true, the Court would still be without

---

[3] The Court notes Plaintiff's assertion that the one-week transition period was not dependent on whether an employee was returning from an approved FFCRA leave, but rather on whether an employee was "experiencing a COVID issue." (Doc. 54 at 2–3). That said, this distinction is irrelevant to the Court's analysis of whether Plaintiff has demonstrated direct evidence that Defendants were motivated to deny his requests to telecommute by a discriminatory animus toward males.

any direct evidence that Defendants denied Plaintiff's requests to work from home *because of his gender*. Plaintiff appears to acknowledge this himself, as his Motion states that the direct evidence shows "that the defendant(s) have not been truthful pertaining to the eligibility requirements of the additional week of telecommuting," *not* that Defendants discriminated against him based on his gender. (Doc. 53 at 3). Likewise, in the Reply, Plaintiff states that his direct evidence "reveal[s] two things: (1) I was eligible for the additional weeks of telecommuting and (2) there was no 'transition' period." (Doc. 128 at 2). Glaringly missing is any assertion by Plaintiff that his direct evidence reveals *discrimination based on gender*, which is all that matters to the direct evidence analysis. Plaintiff has failed to offer any direct evidence that Defendants' decision to deny Plaintiff's requests to telecommute was "more likely than not" motivated by discriminatory reasons.

In the absence of any direct evidence of discrimination, the Court turns to the *McDonnell Douglas* test to determine whether Plaintiff is entitled to summary judgment on his discrimination claims. Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie sex discrimination claim by showing that (1) he belongs to a protected class, (2) he was qualified for and satisfactorily performing his job, (3) he was subject to an adverse employment action, and (4) similarly situated individuals outside his protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. Upon a prima facie showing, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the challenged action." *Id.* If the employer does so, the burden shifts back to the employee to show that the reason offered by the employer "is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (internal quotations omitted) (quoting *Chuang v. Univ. of Cal. Davis*, 215 F.3d 1115, 1123–24 (9th Cir. 2000)).

In the present case, Plaintiff contends that he has met his initial burden of establishing a *prima facie* case of sex discrimination. (Doc. 53 at 5–7). Defendants' Response argues that Plaintiff has failed to make the requisite showing with respect to the

third and fourth elements. (Doc. 123 at 2). As to the *third* element, an "adverse employment action" is defined as "one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks omitted). "The Ninth Circuit takes an expansive view on what constitutes an adverse employment action" and examples include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Ramirez v. Olympic Health Mgmt. Sys., Inc.*, 610 F. Supp. 2d 1266, 1281 (E.D. Wash. 2009) (citing *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000)). Despite this expansive view, "not every employment decision amounts to an adverse employment action" and courts are advised to avoid "trivial personnel actions' brought by irritable, chip-on-the-shoulder employees." *Id.* (quotations and citations omitted).

Here, Plaintiff's gender discrimination claim is entirely based on his claim that he was "denied the benefit of teleworking when [his] female counterparts were not."[4] (Doc. 128 at 3). The question then is whether the denial of an employee's request to telework— *i.e.*, denying a work-from-home request and requiring the employee to work onsite— constitutes an "adverse employment action" for purposes of establishing a discrimination claim. In their Response, Defendants cite to at least seven cases in which courts considered this question and found that such conduct does *not* amount to an adverse employment action. (*See* Doc. 123 at 4–5 (listing cases)). Although none of the cases are from the Ninth Circuit, the Court finds the caselaw persuasive, particularly because Plaintiff does not

---

[4] In the section titled "Element 3: Adverse Employment Action" Plaintiff also refers to the two formal disciplines he received and his eventual termination of employment. (Doc. 53 at 7). However, upon reviewing Plaintiff's Complaint, the Court does not read these to be alleged as "adverse employment actions" that Plaintiff includes in his sex discrimination claims. Rather, Plaintiff alleges that the formal disciplines and his termination were *retaliatory* actions that Defendants took in response to Plaintiff filing internal discrimination complaints. Thus, while the formal disciplines and Plaintiff's termination are considered below in the context of Plaintiff's retaliation claims, the Court does *not* consider them in analyzing Plaintiff's sex discrimination claims.

provide—and this Court itself was unable to find—any cases in which a court found the denial of telecommuting privileges to constitute an adverse employment action.

That said, Plaintiff does attempt to distinguish Defendants' authority, arguing that "[a]ll of the cases cited by the defendants' not one of them have to do with a global pandemic taking place at that time." (Doc. 128 at 3). Although this appears to be true, the fact that a pandemic was ongoing does not transform Defendants' denials of Plaintiff's requests to telecommute in January and February 2021 into adverse employment actions. First, it is not as though Plaintiff was entirely denied the ability to work from home during the pandemic. Rather, Plaintiff telecommuted *every other week* for a *six-month* period between April 2020 and October 2020 pursuant to the biweekly telecommuting policy that was in place. (Doc. 120 at 16). Even after that policy was terminated, Plaintiff was again permitted to telecommute every five weeks pursuant to the rotational telecommuting policy that was in place between December 2020 and March 2021. (*Id.*). Second, it is also not the case that Plaintiff was denied the ability to take available leave when he needed to. Defendants provide evidence that Plaintiff requested—and Defendants granted— *significant* amounts of leave during 2020. In addition to the usual paid and unpaid leave that employees accrued, the FFCRA provided employees like Plaintiff "up to 12 weeks of leave at 40 hours a week for 'caring for a child whose school or place of care is closed . . . for reasons related to COVID-19.'" (*Id.* at 17). Defendants contend that Plaintiff exhausted all his leave, including all his childcare related FFCRA leave, during the year 2020. Given the telecommuting policies that were in place and the significant amount of leave that Plaintiff was granted, the Court cannot find that Defendants' denial of Plaintiff's requests to telecommute—on just a few occasions in January and February 2021—amounted to the sort of adverse employment action which materially affected Plaintiff's compensation, terms, conditions, or privileges of employment. Although Plaintiff disputes the exact parameters of Defendants' policies and the extent to which he used or exhausted his leave, this only raises a material factual dispute and certainly does not satisfy Plaintiff's burden for obtaining summary judgment. The Court finds that Defendants have more than met

their burden of demonstrating a material factual dispute sufficient to preclude summary judgment in Plaintiff's favor.

Even if the Court were to recognize Defendants' denial of Plaintiff's requests to telecommute as an adverse employment action, the Court further finds that Plaintiff has failed to meet the summary judgment standard with respect to the *fourth* element—that is, whether similarly situated individuals outside his protected class were treated more favorably. As to the fourth element, "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003). The plaintiff "must demonstrate, at the least, that they are similarly situated to those employees in all *material* respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (emphasis added). Plaintiff attempts to satisfy the fourth element by pointing to two of his female coworkers, Ms. Hedlund and Ms. Deadrick.[5] (Doc. 53 at 7). In some respects, Ms. Hedlund and Ms. Deadrick were similarly situated. They worked for the same supervisor as Plaintiff, Defendant Romero, and they presumably shared the same job title and duties as Plaintiff. Plaintiff also points out that Ms. Hedlund and Ms. Deadrick, like Plaintiff, had children whose schools were closed due to COVID-19. (*Id.*). However, Defendants point out that Ms. Hedlund and Ms. Deadrick were *differently* situated than Plaintiff in other respects, particularly as it relates to their use of leave. For example, Plaintiff exhausted his FFCRA leave prior to the transition period policy being put into place; Ms. Hedlund and Ms. Deadrick, on the other hand, had *not* exhausted their FFCRA leave. As another example, Plaintiff attempted to take a one-week transition period "suddenly" and without seeking supervisor approval in advance; Ms. Hedlund and Ms. Deadrick, conversely, "planned in advance with their supervisor . . . about the timing of taking the transition telecommuting week." (Doc. 123 at 6–7). These distinctions are

---

[5] As noted above, *see supra* note 2, Plaintiff's Complaint also refers to a *third* female employee, Ms. Reyes. However, Plaintiff makes no mention of Ms. Reyes in his Motion or in the Statement of Facts and therefore the Court will not consider whether Ms. Reyes was a "similarly situated individual" who was treated more favorably than Plaintiff.

material because they imply that Ms. Hedlund and Ms. Deadrick were granted telecommuting permission not because they were women, but because they were returning from an approved FFCRA leave and they properly followed Defendants' policy by speaking with their supervisor in advance. Conversely, the distinctions imply that Plaintiff was denied telecommuting permission not because he was a man, but because he had exhausted his approved FFCRA leave and otherwise misunderstood the transition period policy. The Court recognizes that Plaintiff disagrees with Defendants' explanation of their policies and how those policies applied to Plaintiff and the other employees. The fact that Plaintiff views these facts differently, however, is not sufficient to demonstrate an absence of disputed fact; rather, it does just the opposite by underscoring that the parties dispute material facts as it relates to the fourth element.

In sum, Plaintiff has not demonstrated a prima facie case of disparate treatment because disputed facts exist on material aspects of the third and fourth elements. Even if Plaintiff *had* demonstrated a prima facie case, Defendants have done *more* than enough to articulate a legitimate, nondiscriminatory reason for their denial of Plaintiff's requests to telecommute by explaining the telecommuting and leave policies that were in place and how Plaintiff did or did not adhere to those policies. As the Ninth Circuit has held, "[t]he employer need not persuade the court that it was actually motivated by the proffered reasons." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff" and a defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986)). After viewing the factual record and drawing all reasonable inferences in Defendants' favor, the Court finds that Defendants have put forth admissible evidence raising genuine issues of fact as to whether Defendants discriminated against Plaintiff based on his gender when it denied his requests to telework. Plaintiff has therefore failed to demonstrate an absence of a genuine issue of material fact with respect to his

disparate treatment claims under Title VII and § 1983 and the Court denies Plaintiff's request for summary judgment.

### 2. *Retaliation Claims Under §§ 1981 and 1983*

As an initial matter, the Court denies Plaintiff's request for summary judgment as to his § 1981 retaliation claim and instead dismisses the claim in its entirety. Although the Supreme Court has recognized that § 1981 encompasses retaliation claims, *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008), the statute creates a cause of action "only for those discriminated against on account of their race or ethnicity" and it does *not* permit a plaintiff to assert a claim based on gender discrimination. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008) (citing *Jones v. Bechtel*, 788 F.2d 571, 574 (9th Cir. 1986)); *see also Lowe*, 775 F.2d 998, 1011 (9th Cir. 1985) ("The district court correctly dismissed Lowe's . . . section 1981 sex discrimination claim[ because] sex discrimination cannot be redressed under section 1981."). Here, Plaintiff does not allege any discrimination based on race or ethnicity. Therefore, the Court not only denies summary judgment in Plaintiff's favor, but also grants summary judgment to Defendants and dismisses any claims Plaintiff brings under § 1981. *See Gonzalez v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 654–55 (9th Cir. 2016) (quotations omitted) ("Although Gonzalez did not himself move for summary judgment in the district court, we may grant summary judgment sua sponte to a nonmoving party if, drawing all inferences in favor of the moving party, there are no genuine issues of material fact, the moving party has been given reasonable notice that the sufficiency of his [] claim will be in issue, and the nonmoving party is entitled to summary judgment as a matter of law.").

The Court now turns to Plaintiff's request for summary judgment on his claim for retaliation under § 1983. "The *McDonnell Douglas* framework and allocation of proof that governs disparate treatment claims also governs retaliation claims." *Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1035 (D. Ariz. 2014) (citing *Yartzoff*, 809 F.2d at 1375); *see also Lelaind v. City & Cnty. of S.F.*, 576 F. Supp. 2d 1079, 1094 (N.D. Cal. 2008) ("Like claims for disparate treatment, claims for retaliation under . . . section 1983 . . . are

analyzed under the *McDonnell Douglas* burden-shifting framework."). A plaintiff must first meet his or her burden of establishing a prima facie case of retaliation, which requires the plaintiff to show: "(1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal link between the two." *Cheeks*, 22 F. Supp. 3d at 1035 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)). As with a disparate treatment claim, the burden then shifts to the defendant to "articulat[e] a legitimate, non-retaliatory reason for its action." *Id.* (citations omitted). "Once the defendant has presented a purpose for the action, the plaintiff bears the ultimate burden of providing evidence that the defendant's reason is 'merely a pretext for a retaliatory motive.'" *Id.* (citations omitted).

Here, Plaintiff asserts that he has established a prima facie case of retaliation and that he has additionally provided sufficient evidence that Defendants' reasons for their retaliatory actions are merely pretext. (Doc. 53 at 18–36). Plaintiff contends that Defendants retaliated against him for reporting gender discrimination by issuing two disciplinary actions and ultimately terminating him. (*Id.*). Defendants concede that Plaintiff engaged in a protected activity when he filed an internal complaint for gender discrimination on January 7, 2021. (Doc. 123 at 19). Defendants also concede that Plaintiff suffered an adverse employment action when he was terminated on December 27, 2021 (though they do not explicitly concede that the disciplinary actions constituted "adverse employment actions" for purposes of a retaliation claim). (*Id.*). However, Defendants contend that Plaintiff has failed to establish causation and therefore is not entitled to summary judgment on his retaliation claim. (*Id.*).

The Court finds that, at the least, disputes of material fact exist with respect to the causation element, precluding summary judgment in Plaintiff's favor. For each of the alleged retaliatory actions, Defendants offer alternate explanations—supported by factual evidence—having nothing to do with retaliating against Plaintiff for his internal complaint of gender discrimination. For example, Defendants contend that the March and April 2021 disciplinary action "identified certain City personnel rules and Arizona Code of Judicial Administration sections Plaintiff violated by calling out and refusing to report on site on

February 16, 2021 and by submitting a leave slip asserting COVID symptoms when Plaintiff was unable to get the leave he requested on January 26–27 and February 18, 2021." (Doc. 120 at 20). As to the September and November 2021 disciplinary action and Plaintiff's subsequent termination, Defendants contend that Plaintiff was regularly using the City's computers and printers during work hours for non-work-related tasks such as surfing and watching videos on the internet and printing documents related to personal matters. (*Id.* at 21–23). Defendants also contend that the September and November 2021 disciplinary action and subsequent termination were precipitated by Plaintiff's decreased work productivity, especially as compared to his colleagues. (*Id.*). Upon viewing the factual record and drawing all reasonable inferences in Defendants' favor, the Court finds that Defendants have put forth admissible evidence raising genuine issues of fact as to whether there exists a causal link between the protected activity (Plaintiff reporting gender discrimination) and the adverse employment actions (the disciplinary actions and Plaintiff's termination). Thus, Plaintiff has failed to demonstrate an absence of any genuine issues of material fact with respect to his retaliation claim under § 1983. The Court denies Plaintiff's request for summary judgment on the claim.[6]

### 3. *State Law Claims and Qualified Immunity*

Near the end of his Motion, Plaintiff makes the following argument with respect to his claims under Arizona state law:

> The substantive analysis for Title VII, 1981, and 1983 claims also applies to discrimination and retaliation claims under

---

[6] Given the presence of material factual disputes related to causation, the Court need not delve into other issues raised by the parties as it pertains to Plaintiff's § 1983 retaliation claim. Namely, the Court need not analyze whether Plaintiff has demonstrated that municipal liability is appropriate against the City under a ratification theory, a final policymaker theory, or an official policy or custom theory. Likewise, the Court need not determine whether Plaintiff has demonstrated that *each* of the Individual Defendants took intentional acts—under the color of law and with retaliatory motivations—that deprived Plaintiff of rights secured by the Constitution or federal statutes. The parties clearly dispute facts that are material to the element of causation in Plaintiff's retaliation claim and this is sufficient on its own to deny summary judgment to Plaintiff.

> Arizona Law. Therefore, the conclusions of this [C]ourt on the federal claims of discrimination and retaliation should apply to the State Law claims as well.

(Doc. 53 at 36). As an initial matter, Plaintiff fails to identify which state law claims he seeks summary judgment on. He also fails to state the elements for such claims or make any meaningful, legally supported argument as to why summary judgment in his favor is appropriate on such claims. Regardless, the Court grants Plaintiff's request insofar as he asks that "the conclusions of this [C]ourt on the federal claims . . . should apply to the State Law claims as well." (*Id.*). The Court *denied* Plaintiff's request for summary judgment on his federal claims, and it now does the same with respect to his state law claims. Plaintiff is not entitled to summary judgment as to any of his state law claims.

Plaintiff also makes a short, two-paragraph argument that Defendants Ward, Romero, Curtiss, and Allen are *not* entitled to qualified immunity. (*See id.* at 36–37). The Court rejects this argument because it is entirely conclusory and fails to meaningfully address either prong of the qualified immunity analysis.

### B. Motion for Sanctions

Under Rule 30(d), the Court "may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who *impedes, delays, or frustrates* the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2) (emphasis added). Plaintiff seeks Rule 30(d) sanctions against Defendants Ward and the City based on his allegation that Defendant Ward altered evidence that was used at Plaintiff's September 30, 2022 deposition. (Doc. 105 at 1).

At issue are emails originally sent by City HR Management Assistant Sarah Jenkins and Deputy Internal Services Director Tom Duensing in April 2020 and subsequently forwarded to Plaintiff by HR Specialist Heather Estrada on August 15, 2020. (Doc. 105 at 13–16). On April 8, 2020, Jenkins sent an email containing the subject line "Important Information on the [FFCRA]" that outlined "new HR Guidelines" related to the FFCRA and telecommuting. (*Id.* at 15–16). The following day, Duensing forwarded Jenkins' email to "COT – Timekeepers" along with his own supplemental information about the new

guidelines, which changed the City's previous policy—in place since March 13, 2020—allowing employees to go into a negative balance on leave accruals. (*Id.* at 14–15). On August 14, 2020, Plaintiff emailed Estrada asking why he was "no longer allowed to used [sic] unpaid time to deal with covid related issues." (*Id.* at 13). That same day, Estrada replied by explaining that Plaintiff was referencing the City's previous policy that had been replaced by the FFCRA-based policy in April 2020. (*Id.*). On August 15, 2020, Plaintiff supplemented her response to Plaintiff by forwarding him the April 2020 emails from Duensing and Jenkins, along with the following message:

> Apologies, ended 04/12/2020 not 04/11/2020. This encompasses both the email sent out by Sarah Jenkins and Tom Duensing.

(*Id.* at 14). The August 15, 2020 email from Estrada to Plaintiff—forwarding the April 2020 emails from Duensing and Jenkins—is the primary email at issue in this dispute.

Plaintiff alleges that, during his September 30, 2022 deposition, Defendants entered into the record "Exhibit 17" (*Id.* at 10–11), which contained the August 15, 2020 email from Estrada to Plaintiff. (*Id.* at 2). Plaintiff alleges that he was asked "a series of questions" pertaining to the document which "supported [Defendants'] position regarding time keeping procedures and changes that were allegedly sent to all employees." (*Id.*). Plaintiff alleges that three alterations had been made to the August 15, 2020 email. (*Id.*). First, the header information above the Subject line—which included "(1) From; (2) Sent; (3) To; and (4) CC headers that accompany forwarded emails"—was omitted. (*Id.*). Second, the message from Estrada—provided above—was also omitted. (*Id.*). Third, the "To:" header in Duensing's email was changed from "To: COT – Timekeepers <1c4c65@tempe.gov>" to "To: COT – All Employees." (*Id.*). Plaintiff alleges that the email was altered "with the intent of misleading [him] regarding the facts and circumstances surrounding [his] case" and that sanctions are appropriate. (*Id.* at 3).

In their Response, Defendants make a series of arguments regarding Plaintiff's request for sanctions. First, Defendants argue that Plaintiff's Motion raises a discovery

dispute and that the Court should strike the Motion because Plaintiff did not comply with the correct procedures for raising a discovery dispute. (Doc. 117 at 1–2). In the interest of efficiency and given the unlikelihood that the parties will be able to resolve this dispute on their own, the Court declines to strike the Motion for any procedural error that occurred and will address the Motion on its merits.

Second, Defendants argue that Plaintiff's Motion should be denied because Plaintiff "provides no evidence that his deposition was impeded, frustrated or delayed by the City or Ward" because of the alleged alterations. (*Id.* at 2). Although the Court tends to agree that Plaintiff could have been more specific in this regard, the Court finds Plaintiff's accusation—that Defendants intentionally altered evidence presented at the deposition— to be a *serious* allegation warranting the Court's consideration. At least in the abstract, it is more than reasonable for Plaintiff to suggest that the alteration or spoliation of evidence used at his deposition at least impeded and frustrated "the fair examination" of Plaintiff. Thus, the Court will not outright deny Plaintiff's Motion merely because Plaintiff did not fully explain *how* the fairness of his deposition was impeded or frustrated.

Third, Defendants assert that Plaintiff—when asked about Exhibit 17 at the deposition—"testified that he did not recognize, and did not recall receiving it." (*Id.*). To support this, Defendants attach the relevant portion of the deposition transcript to their Response. (Doc. 117-1 at 2–8). Given this testimony from Plaintiff, Defendants argue that it is impossible to say that Plaintiff's deposition was impeded, frustrated, or delayed by the alleged alterations because Plaintiff did not remember the email anyway. (Doc. 117 at 2– 3). In his Reply, Plaintiff responds that Defendants "failed to provide the part of the [deposition] where [he] identif[ied that he] recognize[d] the contents of the email . . . but am confused because [he didn't] recognize this email being sent to all City of Tempe (COT-employees) employees." (Doc. 121 at 1). Plaintiff cites Rule 32(a)(6) which states that "[i]f a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts." Fed. R. Civ. P. 32(a)(6). Plaintiff does not,

however, provide the Court with the "other parts" of the deposition where he alleges that he recognized Exhibit 17. Nonetheless, the Court will take Plaintiff at his word and is therefore unpersuaded by Defendants' argument that Plaintiff's request for sanctions is rendered moot by the fact that Plaintiff did not initially recognize Exhibit 17 when he was asked about it at the deposition.

Fourth, Defendants argue that Plaintiff is unable to show how the alleged alterations were prejudicial to him or to his case. (Doc. 117 at 3). The Court agrees with Defendants, but only to a certain extent. Plaintiff fails to clearly explain how the first or second alterations—omitting the From/Sent/To/CC headers and the short message from Estrada— meaningfully advanced Defendants' case or harmed his own. Such alterations related only to general heading information and did not change the substance of the email. The Court finds that sanctions or other relief are *not* appropriate for such trivial alterations.[7]

As to the *third* alleged alteration, however, the Court is less certain. Defendants' apparent modification of the "To:" line in Duensing's email relates to the seemingly relevant fact of *who* received Duensing's email in April 2020. As noted above, Duensing's email both forwarded Jenkins' email concerning changes to the City's leave and telecommuting policies *and* provided supplemental information about those changes. If Duensing only sent the email to "Timekeepers," this supports Plaintiff's contention that he was unaware of the relevant policy changes. Conversely, if Duensing sent the email to "All Employees," this supports Defendants' contention that Plaintiff was likely informed of the relevant policy changes. Defendants argue that the only reason Plaintiff was asked about the email at the deposition was to make "the point" that (i) the City's policy was altered by the FFCRA and new City policies *and* (ii) that Plaintiff "was informed" of the changed

---

[7] Defendants offer a *somewhat* plausible explanation for the "From/Sent/To/CC" header omissions—that the conversion of the email to a PDF caused the alteration. (Doc. 117 at 3). To support this, Defendants cite to the Declaration of Defendant Ward (Doc. 117-2 at 2–3). However, the Declaration contains absolutely no reference to the email at issue or to any process by which she converted the email to a PDF. (*See id.*). Therefore, the Court does not consider Defendants' "PDF explanation" in its analysis.

policiy by virtue of the Jenkins and Duensing emails. (Doc. 117 at 3). This argument appears to undermine Defendants' entire position because whether Duensing sent the email to "Timekeepers" or to "All Employees" would seem to directly relate to whether Plaintiff "was informed" of the changed policies. Moreover, Defendants *admit* that Duensing did not send the email to "All Employees." (*Id.* ("[I]t appears after further investigation that Mr. Duensing did not send this email language to "COT – All Employees" on April 9, 2020.")).

Thus, it appears that the Deunsing email—at least the version shown to Plaintiff at his deposition—was, at some point, altered to indicate that it was sent to "All Employees" when it was in fact only sent to "Timekeepers." However, this does not necessarily mean that sanctions are the appropriate remedy. "A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence." *Surowiec v. Cap. Tit. Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011). Here, Plaintiff has likely satisfied the first and third elements. As to the first, Plaintiff attaches a "Preservation Letter" that he sent to Defendants on March 15, 2021, well before this action commenced. (Doc. 105 at 6–7). The Preservation Letter provides evidence  that Defendants had a duty to preserve evidence such as the email at issue. The third element is also satisfied because, as discussed above, the email that was allegedly altered is relevant in this action because it relates to whether Plaintiff was informed of the policy changes. However, the Court finds that Plaintiff has not sufficiently proven that Defendants altered the email with a culpable state of mind. Plaintiff asserts that Defendant Ward "intentionally altered the email with the intent of misleading me regarding the facts and circumstances surrounding my case." (Doc. 105 at 3). This argument is entirely conclusory, however, and does not sufficiently demonstrate that Defendants acted with the requisite culpability.

The Court declines to issue sanctions against Defendants.[8] Sanctions are a particularly harsh remedy and Plaintiff has not adequately shown that Defendants acted with the requisite degree of culpability to warrant such relief. Moreover, Defendants did not, as Plaintiff claims, "create an email that never existed." (Doc. 121 at 4). Rather, the alleged alteration—changing the "To:" line of the email—was relatively minor and left the substantive aspects of the email entirely intact. That said, the Court will address the issue in other ways. Defendants will not be permitted to file Exhibit 17 to Plaintiff's deposition with the Court or otherwise use it to support their case. Defendants are also prohibited from submitting any testimonial evidence that the April 9, 2020 Duensing email was sent to all City employees. The Court finds that such restrictions adequately address the issue by preventing any undue prejudice to Plaintiff's case. The restrictions also do not overly or unnecessarily burden Defendants' case, as Defendants are not prohibited from using *other* evidence to prove Plaintiff's knowledge of the relevant policy changes. To the extent Plaintiff requests adverse jury instructions, the Court finds that such relief would be better addressed at a later point in this litigation. If the need for adverse jury instructions arises, Plaintiff is permitted to make an appropriate request at that time.

Finally, to the extent that Defendants may have intentionally altered the email with the intent of misleading Plaintiff, the Court strongly admonishes such reckless, deceitful, and dishonorable behavior. Defendants are strongly advised that any such behavior in the future will not be tolerated and will result in serious consequences.

## IV.    **CONCLUSION**

In conclusion, the Court finds that numerous genuine disputes of material fact exist as to each of Plaintiff's claims for which he seeks summary judgment. The parties simply do not agree on *numerous* factual issues that are material to Plaintiff's claims. Thus,

---

[8] The Court also declines to grant Plaintiff's request for default judgment against Defendant Ward. (Doc. 105 at 4). Such relief is *very* severe and not warranted under the present circumstances. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) ("A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe.").

Plaintiff is not entitled to summary judgment and the Court denies his Motion. As to Plaintiff's Motion for Sanctions, the Court denies the Motion to the extent it seeks monetary sanctions against Defendants or default judgment against Defendant Ward.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 53) is **denied**. Plaintiff's § 1981 claims are **dismissed**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions (Doc. 105) is **denied** to the extent Plaintiff requests monetary sanctions against Defendant City of Tempe and Defendant Ward. The Court also **denies** Plaintiff's Motion for Sanctions to the extent Plaintiff requests default judgment against Defendant Ward. Defendants are not permitted to file Exhibit 17 to Plaintiff's Deposition with the Court or otherwise use it to support their case. Defendants are also prohibited from submitting any testimonial evidence that the April 9, 2020 email from Tom Duensing was sent to all City employees.

Dated this 17th day of February, 2023.

Honorable Steven P. Logan
United States District Judge